UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES L. DECESARE,

                              Plaintiff,

            -v-

THE AETNA LIFE INSURANCE COMPANY, et al.,

                              Defendants.

Case No. 12-CV-7162(KMK)

OPINION & ORDER

<u>Appearances</u>

Barbara A. Matarazzo, Esq.
Law Office of Barbara A. Matarazzo
White Plains, NY
*Counsel for Plaintiff*

Michael H. Bernstein, Esq.
Matthew Paul Mazzola, Esq.
Sedgwick LLP
New York, NY
*Counsel for Defendant The Aetna Life Insurance Company*

Michael H. Bernstein, Esq.
Sedgwick LLP
New York, NY
*Counsel for Defendant The Dress Barn Long Term
Disability Plan*

KENNETH M. KARAS, United States District Judge:

    Plaintiff Charles L. DeCesare ("Plaintiff" or "DeCesare") brings this Action against

Defendants The Aetna Life Insurance Company ("Aetna") and The Dress Barn Long Term

Disability Plan (the "Plan") (collectively "Defendants") for violations of § 502(a)(1)(B) of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B),

alleging that Defendants improperly discontinued Plaintiff's disability benefits under the Plan based on a determination that Plaintiff was no longer totally disabled.  Plaintiff also alleges that Defendants violated § 503 of ERISA, 29 U.S.C. § 1133, for failing to provide adequate notice setting forth the specific reasons for the denial of benefits under the Plan and for failing to provide a "full and fair review" of Plaintiff's claim.  Defendants move for summary judgment. (Defs.' Mot. for Summ. J. (Dkt. No. 35).)  For the following reasons, Defendants' Motion is granted.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  The Plan

The Dress Barn, Inc. ("The Dress Barn") employed Plaintiff as an AVP Creative Director of Marketing until March 26, 2009.  (Defs.' 56.1 Statement of Material Facts ("Defs.' 56.1") ¶¶ 1, 7 (Dkt. No. 36); Decl. of Julia Bell ("Bell Decl.") 145 (Dkt. No. 37).)[1]  The Dress Barn

---

[1]  Rule 56.1(a) of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  Moreover, "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."  *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417–18 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. Mar. 12, 2012) (same).  Here, Plaintiff failed to submit a response to Defendants' 56.1 statement of facts.  Accordingly, the Court concludes that the facts in Defendants' 56.1 Statement are uncontested and admissible.

established and maintained the Plan, which is an employee welfare benefit plan governed by

ERISA.  (*Id.* ¶¶ 2, 4; Bell Decl. 1–119.)  DeCesare was a participant in the Plan.  (Defs.' 56.1

¶ 5.)  Aetna issued a group insurance policy to fund benefits under the Plan, identified by policy

number GP-818946, effective May 1, 2007.  (Defs.' 56.1 ¶ 3; Bell Decl. 1.)  Aetna served as the

claim administrator for the Plan.  (Defs.' 56.1 ¶ 6; Bell Decl. 44.)

The Plan defines the Test of Disability as follows:

> From the date that you first become disabled and until Monthly Benefits are
> payable for 24 months, you will be deemed to be disabled on any day if . . . you
> are not able to perform the material duties of your own occupation solely because
> of[] disease or injury; and . . . your work earnings are 80% or less of your adjusted
> predisability earnings.

> After the first 24 months that any Monthly Benefit is payable during a period of
> disability, you will be deemed to be disabled on any day if you are not able to
> work at any reasonable occupation solely because of[] disease[] or injury.  If your
> own occupation requires a professional or occupational license or certification of
> any kind, you will not be deemed to be disabled solely because of the loss of that
> license or certification.

(Defs.' 56.1 ¶ 27; Bell Decl. 101 (emphasis omitted).)  The Plan defines "Period of Disability" as

follows:

> A period of disability starts on the first day you are disabled as a direct result of a
> significant change in your physical or mental condition as a result of a disease or
> injury occurring while you are insured under this Plan.  You must be under the
> care of a physician.  (You will not be deemed under the care of a physician more
> than 31 days before the date he or she has seen and treated you in person for the
> disease or injury that caused the disability.)  If Aetna and your physician
> determine that you have reached your maximum point of recovery, you are no
> longer required to be under the care of a physician.  Aetna will require that you
> submit proof of your continuing disability on an annual basis.

(Defs.' 56.1 ¶ 28; Bell Decl. 101 (emphasis omitted).)  The Plan also states that the Period of

Disability ends on the first to occur of several events, including the date "Aetna finds you are no

longer disabled or the date you fail to furnish proof that you are disabled . . . [and] [t]he date an independent medical exam report or functional capacity evaluation fails to confirm your disability." (Defs.' 56.1 ¶ 29; Bell Decl. 102.)  Furthermore, the Plan provides that:

> Under Section 503 of Title 1 of [ERISA], Aetna is a fiduciary.  It has complete authority to review all denied claims for benefits under th[e] policy.  In exercising such fiduciary responsibility, Aetna shall have the discretionary authority to . . . determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of th[e] policy.  Aetna shall be deemed to have properly exercised such authority.  It must not abuse its discretion by acting arbitrarily and capriciously.  Aetna has the right to adopt reasonable[] policies[,] procedures[,] rules, and interpretations[] of th[e] policy to promote orderly and efficient administration.

(Defs.' 56.1 ¶ 30; Bell Decl. 44.)

### 2.  DeCesare's Claim for Short Term Disability Benefits

On March 27, 2009, DeCesare submitted his claim for Short Term Disability ("STD") benefits due to his anticipated absence from work following spinal surgery scheduled for March 30, 2009.  (Defs.' 56.1 ¶ 8; Bell Decl. 145–146, 170, 177.)  In support of his claim, DeCesare submitted an Attending Physician Statement ("APS") dated March 30, 2009, from Dr. Debra Benzil ("Dr. Benzil"), his treating neurosurgeon.  (Defs.' 56.1 ¶ 9; Bell Decl. 1736–38.)  The APS indicated that DeCesare underwent spinal surgery on March 30, 2009, was "currently [and] completely disabled," and was restricted from "driving, lifting, pushing, [and] pulling."  (Defs.' 56.1 ¶¶ 9–10; Bell Decl. 1737.)  Moreover, Dr. Benzil attached to the APS her office note dated March 17, 2009, which details her examination of DeCesare relating to his pre-operative complaints of back pain and her recommendation for surgery.  (Defs.' 56.1 ¶ 10; Bell Decl. 1738.)  After reviewing DeCesare's claim for STD benefits, Aetna certified his period of

4

disability for 42 days (March 30, 2009 through May 10, 2009) by letter dated April 14, 2009. (Defs.' 56.1 ¶ 11; Bell Decl. 203.)

Dr. Benzil submitted an additional APS dated April 28, 2009, stating that DeCesare was "recovering from extensive spinal surgery" performed on March 30, 2009, and that DeCesare had "[n]o ability to work," and was restricted from "lifting, pulling, pushing, [and] driving." (Defs.' 56.1 ¶¶ 12–13; Bell Decl. 1725–26.)  Dr. Benzil estimated that DeCesare would be able to return to work on June 8, 2009.  (Defs.' 56.1 ¶ 13; Bell Decl. 1726.)  The APS also referenced an office note dated April 21, 2009, in which Dr. Benzil reported on DeCesare's post-operative follow-up visit three weeks after his surgery and stated that DeCesare had been on methadone pre-operatively and was then "down to about five Percocet per day."  (Defs.' 56.1 ¶ 14–15; Bell Decl. 1661, 1725.)  The office note explained that DeCesare had "made excellent early progress considering he had been on methadone for almost a year" and he was "already on significantly less medication."  (Defs.' 56.1 ¶ 17; Bell. Decl. 1661.)  By letter dated May 5, 2009, Aetna certified DeCesare's claim for continuing STD benefits for an increased period of disability of 70 days (March 30, 2009 to June 7, 2009).  (Defs.' 56.1 ¶ 18; Bell Decl. 192, 206.)

In a letter dated June 2, 2009, Dr. Benzil informed Aetna that DeCesare should remain out of work through July 7, 2009.  (Defs.' 56.1 ¶ 19; Bell Decl. 1660.)  In an office note dated June 2, 2009, Dr. Benzil reported that she saw DeCesare for a follow-up visit and noted that he had "generally done well since surgery" and was "making progress."  (Defs.' 56.1 ¶¶ 20–21; Bell Decl. 1659.)  In the same note, Dr. Benzil also stated that DeCesare could "begin to significantly increase his activity [by] doing more back flexibility and back strengthening work."  (Defs.' 56.1

5

¶ 22; Bell Decl. 1659.)  Moreover, Dr. Benzil reported that DeCesare could "do some bending" but "still need[ed] to refrain from heavy working."  (Defs.' 56.1 ¶ 22; Bell Decl. 1659.)  She concluded that DeCesare could "remain out of work for an additional four weeks[,] [and] [a]fter such time . . . it [was] okay for him to return to work, perhaps on light duty."  (Defs.' 56.1 ¶ 22; Bell Decl. 1659.)

Dr. Steven Hoverman ("Dr. Hoverman"), one of DeCesare's primary care physicians, stated in an APS dated June 3, 2009 that DeCesare had symptoms of "back pain" and that he had "[n]o ability to work."  (Defs.' 56.1 ¶ 23; Bell Decl. 1671–72.)  On June 4, 2009, Dr. Hoverman completed a Capabilities and Limitations Worksheet, indicating that DeCesare was capable of working zero hours per day.  (Defs.' 56.1 ¶ 24; Bell Decl. 1673.)

By letter dated June 9, 2009, Aetna certified DeCesare's claim for STD benefits for a period of 100 days, and by letter dated June 23, 2009 extended his disability period for 189 days (March 30, 2009 to October 4, 2009).  (Defs.' 56.1 ¶¶ 25–26; Bell Decl. 195, 199.)  In its June 23, 2009 letter, Aetna advised DeCesare that his STD benefits would be exhausted as of October 4, 2009.  (Defs.' 56.1¶ 26; Bell Decl. 199, 218.)

### 3.  DeCesare's Claim for Long-Term Disability Benefits

On May 24, 2009, DeCesare's claim file was transferred from Aetna's STD Claim Unit to its Long Term Disability ("LTD") Claim Unit to allow the LTD Unit to begin its review. (Defs.' 56.1 ¶ 31; Bell Decl. 532.)[2]  During an initial telephone interview on June 3, 2009,

---

[2] Defendants' 56.1 Statement claims that DeCesare's file was transferred to the LTD Unit on May 27, 2009, (Defs.' 56.1 ¶ 31), but Aetna's documentation indicates it was transferred on May 24, 2009, (Bell Decl. 532).  In any event, this discrepancy is not material to the issues

DeCesare informed Aetna that he had undergone back surgery on March 30, 2009, and was attending physical therapy twice per week.  (Defs.' 56.1 ¶ 32; Bell Decl. 541.)  DeCesare also stated that he was unsure whether he could return to work on July 7, 2009 because his job required him to "do a lot of lifting . . . on photo shoots," and he did not feel he was able to perform the bending, lifting, or carrying that his job required.  (Defs.' 56.1 ¶ 33; Bell Decl. 541.)  He reported that his physician advised him not to lift more than a half gallon of milk and not to engage in any lifting, pushing, or pulling.  (Defs.' 56.1 ¶ 34; Bell Decl. 542.)

At Aetna's request, DeCesare submitted a Work History and Education Questionnaire dated June 4, 2009.  (Defs.' 56.1 ¶ 35; Bell Decl. 1676.)  On the questionnaire, he described his job as an "AVP Director" as "[l]ifting heavy boxes, climbing ladders to install heavy objects[,] stage set-ups[,] lifting props[,] furniture[,] equipment[,] [and] walls[,] photo shoot set ups[,] 10– 15 h[our] a day on feet[,] lifting equipment[,] [and] set-up."  (Defs.' 56.1 ¶ 35; Bell Decl. 1680.)  DeCesare stated he was unable to perform any of these tasks due to "extreme pain" in his back.  (Defs.' 56.1 ¶ 35; Bell Decl. 1680.)

On or about June 11, 2009, The Dress Barn provided a job description for DeCesare's position as "Creative Director—in store visuals and design."  (Defs.' 56.1 ¶ 36; Bell Decl. 1691.)  The physical demands listed in the job description included:

- Ability to stand and walk for long period[s] of time (photo shoots, store visits, vendor visits)[;]
- Carrying, pushing, pulling, stretching, reaching, twisting, bending [for] 25% of time[;]
- Climbing ladders 10% of time[;]
- Lifting over 20 to 40 pounds, at time[s] repetitive[ly] [for] 20% of time[;]

---

presented here.

- Travel over 50% driving and air travel to stores, vendors[,] and photo shoots[;]
- Sitting 20% of time[;]
- Hand dexterity [including] keyboarding, sketching [for] 10% of time[;]
- Setting up stores with heavy fixtures to show prototypes and stage setups[;]
- Hanging posters [and] dimension objects[,] including merchandise while on ladders[.]

(Defs.' 56.1 ¶ 36; Bell Decl. 1691.)

On June 28, 2009, DeCesare became eligible for LTD benefits.  (Defs.' 56.1 ¶ 37; Bell Decl. 548.)  By letter dated June 11, 2009, Aetna advised DeCesare that he would be eligible to receive monthly LTD benefits effective June 28, 2009 because it had determined that he met the Plan's "own occupation" definition of disability.  (Defs.' 56.1 ¶ 38; Bell Decl. 385–87.)  The letter stated that based on the terms of the Plan, DeCesare could be eligible for benefits for up to 24 months, as long as he remained disabled from his own occupation and Aetna would periodically re-evaluate his eligibility for continuing LTD benefits by requesting updated medical information from his treating physician or a physician of Aetna's choice.  (Defs.' 56.1 ¶¶ 39–40; Bell Decl. 385.)  Aetna also informed DeCesare that if he was still disabled as of June 28, 2011, the Plan required that he meet a more restrictive definition of disability, requiring him to demonstrate that he was not able to work at "any reasonable occupation solely because of[] disease[] or injury."  (Defs.' 56.1 ¶ 41; Bell Decl. 385.)

By letter dated June 17, 2009, Dr. Hoverman advised Aetna that DeCesare "continue[d] to be disabled from the duties of work," specifically lifting, climbing, pushing of heavy objects, and sitting and standing for long periods of time, and that he recommended "continu[ing] Disability until October 31, 2009."  (Defs.' 56.1 ¶ 42; Bell Decl. 1692.)  On or around July 1,

8

2009, Aetna Claim Analyst Allison Tardif ("Tardif") requested DeCesare's updated medical records.  (Defs.' 56.1 ¶ 43; Bell Decl. 561–62.)[3]  On October 21, 2009, Tardif received and reviewed a letter from Dr. Hoverman dated October 14, 2009, informing Aetna that he evaluated DeCesare on September 30, 2009 and recommended that he "remain disabled from work given the progress of his lumbar decompression and inter body fusion."  (Defs.' 56.1 ¶ 44; Bell Decl. 565, 1646.)  In the letter, Dr. Hoverman reported that DeCesare was continuing physical therapy with pain management and medication, but that his limitations included "no lifting, climbing, pushing of heavy objects, and sitting or standing for long periods of time."  (Defs.' 56.1 ¶ 45; Bell Decl. 1646.)  Dr. Hoverman concluded that "[d]ue to slow healing and chronic pain, [he recommended DeCesare's] disability continue until March 31, 2010."  (Defs.' 56.1 ¶ 46; Bell Decl. 1647.)  After reviewing the letter, Tardif ordered DeCesare's updated physical therapy records.  (Defs.' 56.1 ¶ 47; Bell Decl. 566.)

On November 11, 2009 Aetna received DeCesare's physical therapy records regarding treatment he had received from April 30, 2009 to October 20, 2009 from St. Anthony's Community Hospital Center for Physical Rehabilitation ("St. Anthony's").  (Defs.' 56.1 ¶ 48; Bell Decl. 568, 1616–1640.)[4]  In a physical therapy ("PT") note dated April 30, 2009, the physical therapist reported that DeCesare complained that his back was "still painful."  (Defs.'

---

[3] The Court adopts the spelling of Tardif's name as it appears in the record, not as spelled in Defendants' 56.1 Statement.

[4] The Court notes that many of the handwritten physical therapy ("PT") notes, as well as the notes from DeCesare's treating physicians, as described below, are unintelligible.  To the extent that the Court could not determine what the notes stated, it relied on Defendants' undisputed 56.1 Statement.

9

56.1 ¶ 49; Bell Decl. 568, 1616.)  In a PT note dated July 29, 2009, the physical therapist noted that DeCesare complained of pain at a level of seven out of ten, and upon physical examination demonstrated that his lumbosacral flexion was 0–25 degrees, rotation on the left was 0–20 degrees, and rotation on the right was 0–20 degrees.  (Defs.' 56.1 ¶ 50; Bell Decl. 568, 1621, 1636.)  The physical therapist also noted that DeCesare's condition was slowly improving. (Defs.' 56.1 ¶ 51; Bell. Decl. 568, 1621, 1636.)  DeCesare attended PT on September 9, 2009 and demonstrated decreased functionality and pain and, thus, the physical therapist recommended that he begin a pain management program.  (Defs.' 56.1 ¶ 52; Bell. Decl. 568, 1622.)  At a PT session on October 15, 2009, DeCesare reported constant pain at a level of eight out of ten, he complained of "feel[ing] really sore [with] cold weather," and the physical therapist stated that although he was progressing slowly, there was still weakness in his lower back.  (Defs.' 56.1 ¶¶ 53–54; Bell Decl. 568, 1623, 1642.)  In a PT note dated October 20, 2009, the physical therapist noted that DeCesare would continue with a course of PT to increase strength in his lower back.  (Defs.' 56.1 ¶ 55; Bell Decl. 568, 1642.)  After a review of these records, Tardif decided to refer DeCesare's records for a review by a nurse consultant.  (Defs.' 56.1 ¶ 56; Bell Decl. 568.)

Tardif contacted DeCesare to conduct an interview on November 30, 2009.  (Defs.' 56.1 ¶ 57.)  During the interview, DeCesare reported that due to his lower back pain, he shopped for groceries with his wife, only drove very short distances, did not use a computer because of his difficulty with sitting, did not sleep well because of his pain, and his energy level was only at 25% of what it "used to be."  (Defs.' 56.1 ¶ 57; Bell Decl. 569.)  DeCesare also stated that the

"biggest obstacles" to returning to work included his pain, his limited ability to lift and sit for long periods of time, and his decreased concentration level due to his pain. (Defs.' 56.1 ¶ 58; Bell Decl. 570.) Following the interview, Tardif ordered all of DeCesare's medical records from Dr. Hoverman. (Defs.' 56.1 ¶ 59; Bell Decl. 571.)

During a follow-up telephone call with Tardif on January 5, 2010, DeCesare reported that he experienced pain every day, and while he was trying to stop taking prescription medications, the pain was so severe that he was unable to "sit down or do anything." (Defs.' 56.1 ¶ 60; Bell Decl. 574.) He also stated that he was unsure of whether he should have had the surgery, was concerned about the quality of his life, was going to PT twice per week, was still seeing Dr. Hoverman, as well as a pain management specialist, and had not seen his back surgeon. (Defs.' 56.1 ¶¶ 61–62; Bell Decl. 574.) On January 5, 2010, Tardif transferred DeCesare's claim for continuing LTD benefits to Claim Examiner Kelly Wiers ("Wiers") due to its complexity. (Defs.' 56.1¶ 63; Bell Decl. 574–78.)

On March 6, 2010, Wiers requested that DeCesare's treating physician provide updated APS forms to assess his current level of functional capacity, and informed DeCesare that he was required to provide "objective medical evidence from [his] attending physician" supporting the claim that he remained totally disabled. (Defs.' 56.1 ¶¶ 64–65; Bell Decl. 401, 585.) On March 24, 2010, Wiers received Dr. Hoverman's APS, in which he diagnosed DeCesare with lumbar spinal stenosis, secondary to osteocarthritis of the knee and stated that DeCesare had "[n]o ability to work" and required narcotics and analgesics to function with the pain. (Defs.' 56.1 ¶¶ 66–67; Bell Decl. 2004–05.) Dr. Hoverman indicated that DeCesare's status had

11

"[r]egressed" because of his "inability to achieve satisfactory pain resolution." (Defs.' 56.1 ¶ 68; Bell Decl. 2005.) Dr. Hoverman also completed a Capabilities and Limitations Worksheet indicating that DeCesare was capable of working zero hours per day. (Defs.' 56.1 ¶ 69; Bell Decl. 2009.)

On April 23, 2010, Wiers conducted a follow-up interview with DeCesare. (Defs.' 56.1 ¶ 70; Bell Decl. 589.)[5] During the interview, DeCesare stated that he experienced significant pain on a daily basis and was currently taking narcotic prescription medications, including Opana, Diazepam, and Toprol. (Defs.' 56.1 ¶ 70; Bell Decl. 590.) He also informed Wiers that he was attending PT two times per week in an attempt to get stronger, but while he had injections and acupuncture, there had been no relief for his situation. (Defs.' 56.1 ¶¶ 71–72; Bell Decl. 590.)

DeCesare's claim was referred to Aetna's Complex Claim Investigative Unit ("CCIU") on April 27, 2010 because his medical records indicated that his surgeon initially reported that he should only be out of work for a maximum of 84 days following his surgery. (Defs.' 56.1 ¶ 73; Bell Decl. 594.) Aetna Senior Technical Specialist Teri Kili ("Kili") performed a detailed database and internet search, but found no information on DeCesare other than his home address, car, and neighborhood information, and Kili stated that her search did not raise any red flags beyond the fact that the "expected duration for time of [his] surgery exceeded normal durations." (Defs.' 56.1 ¶¶ 74–75; Bell Decl. 594.) Kili recommended that Aetna conduct a full clinical review, a detailed claimant interview, send a Capabilities and Limitations Worksheet to

---

[5] Defendants' 56.1 Statement erroneously states that the follow-up interview occurred on

DeCesare's treating physicians for completion, and check the terms of the Plan to determine if mandatory rehabilitation would be appropriate.  (Defs.' 56.1 ¶ 76; Bell Decl. 594.)  DeCesare's file was returned to Wiers and she ordered updated medical records.  (Defs.' 56.1 ¶ 77; Bell Decl. 597.)

DeCesare submitted his Notice of Award from the Social Security Administration ("SSA") dated July 31, 2010 to Aetna, which indicated that he was awarded Social Security Disability Income ("SSDI") benefits beginning in September 2009 in the amount of $2,175 per month.  (Defs.' 56.1 ¶ 78; Bell Decl. 894–98.)  DeCesare was also awarded retroactive SSDI benefits in the amount of $23,761 for the period of time between September 2009 and July 31, 2010.  (Defs.' 56.1 ¶ 79; Bell Decl. 894–95.)

By letter dated December 29, 2010, Aetna advised DeCesare that because the Plan Elimination Period expired on June 28, 2009, the 24-month "own occupational" disability period would end with Aetna's benefit payment on June 27, 2011 (the "Test Change Date") and that to be entitled to LTD benefits after that date, DeCesare would need to be considered "disabled from performing any gainful occupation."  (Defs.' 56.1 ¶ 80; Bell Decl. 418–19.)  Aetna also informed DeCesare that it would commence its review of his claim for continuing LTD benefits under the "any gainful occupation" disability test in anticipation of the Test Change Date, and requested that he complete an updated Work History and Education Questionnaire, a Medical Professionals List, an Other Income Questionnaire, and an Authorization to Request Protected Health Information form.  (Defs.' 56.1 ¶ 81; Bell Decl. 419.)

April 23, 2011.  (Defs.' 56.1 ¶ 70.)

13

In his Work History and Education Questionnaire dated January 5, 2011, DeCesare stated that he had a Bachelors Degree in Fine Arts and that prior to working at The Dress Barn in 2000, he was employed at Hechts as a Creative Director from 1991 to 1997.  (Defs.' 56.1 ¶ 82; Bell Decl. 1420–21.)  DeCesare explained that his job at Dress Barn required him to "display setups," which included activities such as "lifting, pushing, pulling, [and] climbing ladders," that he was required to "frequently" bend or stoop, crawl, reach above the shoulders, kneel, push or pull, lift up to 10 pounds, 11-25 pounds, 26-50 pounds, and 50 pounds or more, and that he worked 10-hour days during which he was "continuously" sitting, standing, and walking.  (Defs.' 56.1 ¶¶ 83–85; Bell Decl. 1420.)  He also reported that due to his disability, he was unable to renovate his house, play basketball, run, plant shrubs, sculpt, and perform household chores, and that he could "no longer do anything" and "fe[lt] worthless as the smallest activity cause[d] pounding pain in [his] back and knees."  (Defs.' 56.1 ¶¶ 86–87; Bell Decl. 1421.)

Aetna received an APS and Capabilities and Limitations Worksheet from Dr. Shuang-Ping Wang ("Dr. Wang"), DeCesare's primary care physician, on January 14, 2011.  (Defs.' 56.1 ¶ 89; Bell Decl. 621, 1108–09.)  In the APS dated January 10, 2011, Dr. Wang listed DeCesare's symptoms as "severe back and knee pain," diagnosed DeCesare with spinal stenosis, secondary to osteoarthritis of the knees, indicated that DeCesare had "[n]o ability to work," and could not participate in a Vocational Rehabilitation program due to his inability to control his pain.  (Defs.' 56.1 ¶¶ 90–93; Bell Decl. 1108–09.)  On January 11, 2011, Aetna received DeCesare's medical records from July 20, 2009 through December 20, 2010 from Dr. Michael Dobrow ("Dr. Dobrow"), DeCesare's treating pain management specialist.  (Defs.' 56.1 ¶ 94; Bell Decl. 620.)

14

In his most recent office note dated December 20, 2010, Dr. Dobrow stated that DeCesare continued to suffer from lower back pain to both legs, which worsened with physical activity. (Defs.' 56.1 ¶ 95; Bell Decl. 942.)  Dr. Dobrow indicated that DeCesare was prescribed Roxicodone and Opana and that he was "able to take care of his obligations to his job and family and able to maintain his activities of daily living with the help of the medications and he denies any side effects of the medications."  (Defs.' 56.1 ¶¶ 96–97; Bell Decl. 943.)  Dr. Dobrow also noted that DeCesare walked with a limp and that his examination of DeCesare's lumbar spine did not change from his previous examination.  (Defs.' 56.1 ¶ 98; Bell Decl. 942.)

Aetna referred DeCesare's case to Nurse Diane Studenroth for a clinical review.  (Defs.' 56.1 ¶ 99; Bell Decl. 625–27.)  Studenroth reviewed DeCesare's medical records, including several MRI and X-ray reports, specifically an MRI of his lumbar spine conducted on March 30, 2009, an MRI of his right knee conducted on May 17, 2010, and X-rays of his lumbar spine on May 21, 2009 and September 29, 2009.  (Defs.' 56.1 ¶¶ 101–03; Bell Decl. 625, 849–50, 917–18.)  Based on her review, Studenroth concluded that it was unclear if the clinical information supported an ongoing functional impairment of a severity that would preclude DeCesare from performing work at medium and/or lesser levels of physical demand, due to a lack of sufficiently documented clinical, quantifiable measurements.  (Defs.' 56.1 ¶ 104; Bell Decl. 627.)  Accordingly, Studenroth recommended that Aetna retain an independent peer review physician board certified in occupational medicine to review DeCesare's records and provide an opinion concerning DeCesare's level of functionality and status to return to work.  (Defs.' 56.1 ¶ 105; Bell Decl. 627.)

15

On March 4, 2011, Wiers contacted DeCesare via telephone to conduct an updated claimant interview.  (Defs.' 56.1 ¶ 106; Bell Decl. 627–28.)  During the interview, DeCesare complained of continuing severe pain in his back, as well as depression because he could not do anything.  (Defs.' 56.1 ¶ 107; Bell Decl. 628.)  He stated that he was not treating or taking any medications for his depression.  (Defs.' 56.1 ¶ 108; Bell Decl. 628.)  He also reported that he had issues with his knee and was discussing a possible knee replacement with his treating physician. (Defs.' 56.1 ¶ 109; Bell Decl. 628.)  DeCesare also informed Wiers that he was not considering any further surgery on his back and was not attending PT.  (Defs.' 56.1 ¶ 110; Bell Decl. 628.) He stated he did not think he could return to work because he could only sit for ten minutes at a time before he had to lie down.  (Defs.' 56.1 ¶ 111; Bell Decl. 628.)

On March 15, 2011, Weirs received and reviewed PT records from St. Anthony's regarding DeCesare's PT sessions from January 19, 2010 through June 22, 2010.  (Defs.' 56.1 ¶ 113; Bell Decl. 634, 909–13.)[6]  Specifically, DeCesare attended PT on January 19 and 21, 2010, February 18, 2010, March 9, 16, 18, 23, and 25, 2010, April 1, 6, 15, and 20, 2010, and May 7, 2010.  (Defs.' 56.1 ¶ 114; Bell Decl. 909–13.)  At the PT session on January 19, 2010, DeCesare reported that he experienced constant back pain and his physical therapist noted PT was limited due to his bilateral arthritic knees, which resulted in a decreased ability to use his legs for bending, but that he tolerated PT well without increased pain.  (Defs.' 56.1 ¶ 115; Bell

---

[6] Defendants state in their 56.1 Statement that Aetna received the PT records from January 21, 2010 through June 22, 2010.  (Defs.' 56.1 ¶ 113.)  The first PT note, however, is dated January 19, 2010.  (Bell Decl. 909.)  This discrepancy is not material in resolving the instant Motion.

Decl. 909.)  During his PT session on January 21, 2010, DeCesare reported that he was experiencing constant back pain, but demonstrated increased strength and reported decreased pain.  (Defs.' 56.1 ¶ 116; Bell Decl. 909.)  At his PT session on March 16, 2010, DeCesare reported having trouble each day doing anything more than sitting or regular activities, but his physical therapist noted increased strength.  (Defs.' 56.1 ¶ 117; Bell Decl. 909.)  At his PT session on March 23, 2010, DeCesare reported that he was not feeling very well and while he performed therapeutic exercises well, he complained of discomfort.  (Defs.' 56.1 ¶ 119; Bell Decl. 911.)  At the PT session on March 25, 2010, DeCesare reported that stretching his back felt good and reported decreased pain after the session.  (Defs' 56.1 ¶ 120; Bell Decl. 911.)  During his PT session on April 1, 2010, DeCesare reported feeling better after receiving treatment, but that he was tired.  (Defs.' 56.1 ¶ 121; Bell Decl. 911.)  At his PT session on April 5, 2010, DeCesare reported that he still felt spasms in his lower back and "S1" joint area.  (Defs.' 56.1 ¶ 122; Bell Decl. 911.)  During his PT session on April 15, 2010, DeCesare reported that his back was hurting and that he had experienced a setback, and on April 20, 2010 DeCesare stated that he had been self-medicating due to constant pain, but also demonstrated increase range of motion in his lumbar spine and increased strength.  (Defs.' 56.1 ¶¶ 123–24; Bell Decl. 913.)  During his PT session on May 7, 2010, DeCesare complained of pain at the level of six out of ten in his lower back, with sharp pain in his left side.  (Defs.' 56.1 ¶ 125; Bell Decl. 913.)

Aetna received Dr. Hoverman's handwritten office visit notes from May 12, 2010 through February 9, 2011.  (Defs.' 56.1 ¶ 126; Bell Decl. 636.)  In his office visit note dated May 12, 2010, Dr. Hoverman reported that DeCesare informed him that while walking down the

17

stairs, his knee popped causing tenderness and the inability to fully straighten his knee, and thus, both of his knees were "bone on bone." (Defs.' 56.1 ¶ 127; Bell Decl. 1454.) During his visit to Dr. Hoverman's office on July 13, 2010, DeCesare reported that he had experienced increased right knee pain since it gave way. (Defs.' 56.1 ¶ 128; Bell Decl. 1387.) In his office note dated November 3, 2010, Dr. Hoverman reported that DeCesare's recent spine X-ray demonstrated severe changes at levels in "T11 to sacrum," that fusion was noted, that DeCesare was experiencing bilateral knee crepitus, and that Dr. Hoverman considered prescribing cortisone injections. (Defs.' 56.1 ¶ 129; Bell Decl. 1386.) In his office visit note dated December 13, 2010, Dr. Hoverman stated that DeCesare complained of knee pain after his prior injections. (Defs.' 56.1 ¶ 130; Bell Decl. 1385.) Dr. Hoverman administered an injection and diagnosed DeCesare with spinal stenosis, which he stated did not improve with surgery. (Defs.' 561. ¶ 130; Bell Decl. 1385.) In his office visit note dated January 7, 2011, Dr. Hoverman stated that DeCesare complained of ongoing back pain and referenced his most recent CT of his lumbar spine, which demonstrated "stable posterior spinal fusion, [and] no evidence of fracture/spondylolisthesis." (Defs.' 56.1 ¶ 131; Bell Decl. 1384.) On January 14, 2011, Dr. Hoverman wrote DeCesare a prescription for Oxycodone, and on January 26, 2011 he wrote DeCesare a prescription for Diazepam. (Defs.' 56.1 ¶ 132; Bell Decl. 1383.) According to his medical records, on January 31, 2011, Dr. Hoverman received a telephone call from DeCesare's health insurance company advising him of DeCesare's controlled substance overuse because it was documented that he was currently prescribed Opana XR, Opana, and Oxycodone from Dr. Dobrow and Diazepam and Oxycodone from Dr. Hoverman. (Defs.' 56.1 ¶ 133; Bell Decl.

18

1383.)  Dr. Hoverman indicated that he would discuss this issue with DeCesare at his next scheduled office visit.  (Defs.' 56.1 ¶ 133; Bell Decl. 1383.)

Wiers referred DeCesare's updated medical records to Studenroth for a further clinical review.  (Defs.' 56.1 ¶ 135; Bell Decl. 636.)  After reviewing the medical records, Studenroth concluded that there were insufficient quantifiable, clinical findings to support DeCesare's claimed inability to work.  (Defs.' 56.1 ¶ 145; Bell Decl. 638.)  Studenroth also stated that DeCesare's medical records demonstrated that he was able to perform activities of daily living without incident and determined that an independent medical record peer review of DeCesare's medical records was warranted to establish functionality.  (Defs.' 56.1 ¶¶ 146–47; Bell Decl. 638.)

On April 29, 2011, Aetna received Dr. Dobrow's updated medical records, including his most recent office visit note dated March 14, 2011.  (Defs.' 56.1 ¶ 138; Bell Decl. 648, 950.)  In the note, Dr. Dobrow stated that DeCesare was following up for pain management, he was currently on Opana—which allowed him to continue his activities of daily living without experiencing side effects—DeCesare reported lumbar pain at a level of eight out of ten, and the physical examination revealed that DeCesare was alert, oriented, in no acute distress, and his lumbar spine examination had not changed since his previous examination.  (Defs.' 56.1 ¶¶ 139–41; Bell Decl. 950.)  Dr. Dobrow's impression included lumbar disc herniation, lumbar facet joint syndrome, lumbar radiculopathy, insomnia, chronic pain syndrome, Hepatitis C (in remission), and thrombocytopenia.  (Defs.' 56.1 ¶ 142; Bell Decl. 951.)  Dr. Dobrow indicated that DeCesare was to continue taking his prescription medication and visit again in four weeks.

19

(Defs.' 56.1 ¶ 143; Bell Decl. 951.)  Following Wiers' review of these medical records, she forwarded them to Studenroth.  (Defs.' 56.1 ¶ 144; Bell Decl. 652.)

After reviewing the records from Dr. Dobrow, Studenroth concluded that it remained unclear if the clinical information supported a functional impairment that would preclude even sedentary physical work activities due to a musculoskeletal condition.  (Defs.' 56.1 ¶ 136; Bell Decl. 650.)  Studenroth stated that it would be beneficial to review DeCesare's medical records from his treating pain management specialist to assist her with establishing his functionality and ability to return to work prior to obtaining a peer review and, therefore, recommended that Wiers order DeCesare's clinical records from June 2010 through the present day, as well as a current Capabilities and Limitations Worksheet from Dr. Dobrow.  (Defs.' 56.1 ¶ 137; Bell Decl. 650.)

On June 3, 2011, Wiers requested an independent medical record peer review by a physician specializing in Occupational Medicine, and accordingly Aetna assigned peer reviewer Robert Swotinsky, M.D. ("Dr. Swotinsky"), Board Certified in Occupational Medicine to evaluate DeCesare's eligibility for continued LTD benefits.  (Defs.' 56.1 ¶ 148; Bell Decl. 654–57, 494–502.)  Dr. Swotinsky reviewed the medical records and attempted to contact DeCesare's treating physicians.  (Defs.' 56.1 ¶ 149; Bell Decl. 1087–89.)  In his report dated June 17, 2011, Dr. Swotinsky stated that after three unsuccessful attempts, he was unable to speak with Dr. Dobrow.  (Defs.' 56.1 ¶ 150; Bell Decl. 1088, 1093.)  Dr. Swotinsky spoke with Dr. Wang, who reported that he and his partner, Dr. Hoverman, had been treating DeCesare for several years and expressed concern about the large amount of narcotics he was receiving, as well as problems with DeCesare receiving narcotics from multiple physicians.  (Defs.' 56.1 ¶ 151; Bell Decl.

1088.)  Dr. Wang initially indicated that DeCesare could perform in a sedentary job, but then said he was unsure how long DeCesare could sit due to his badly controlled diabetes, Hepatitis C, and depression.  (Defs.' 56.1 ¶ 152; Bell Decl. 1089.)  In his report, Dr. Swotinsky noted that DeCesare had several medical conditions, specifically low back pain, opioid dependence, Hepatitis C, diabetes, and left knee meniscal tears.  (Defs.' 56.1 ¶ 153; Bell Decl. 1089–91.)  Dr. Swotinsky noted that DeCesare had "spinal stenosis that limit[ed] him to some extent."  (Defs.' 56.1 ¶ 154; Bell Decl. 1090.)  Dr. Swotinsky opined that DeCesare's spinal stenosis was not completely disabling "per the SSA's criteria," and that documentation from Dr. Dobrow state[d] that DeCesare was able to perform activities of daily living, if not his job, and Dr. Wang said the claimant drove.  (Defs.' 56.1 ¶ 155; Bell Decl. 1090–91.)  Accordingly, Dr. Swotinsky explained that "[b]ecause [DeCesare's] back condition d[id] not meet [the] criteria for complete disability and information from the treating providers indicat[ed] that he [was] reasonably active, [his] opinion [was] the documentation and peer-to-peer discussion established that [DeCesare was] at least [at] a sedentary work capacity."  (Defs.' 56.1 ¶ 155; Bell Decl. 1091.)  Dr. Swotinsky opined that DeCesare's opioid dependence would preclude him from working in certain safety-sensitive jobs and from working where opioid narcotics are readily available, but did not limit him from working as a marketing executive.  (Defs.' 56.1 ¶ 156; Bell Decl. 1091.)  Moreover, Dr. Swotinsky concluded that DeCesare's Hepatitis C was in remission and would pose no impairment, the medical documentation indicated no complications relating to DeCesare's diabetes and would not correspond to any functional impairment, and while the nature of his knee impairment was unclear, it would "not prevent him from doing sit-down

21

work" because "he appear[ed] functional and there [was] no orthopedic notes about his knees or other specific and comprehensive findings." (Defs.' 56.1 ¶¶ 157–59; Bell Decl. 1091–92.) Dr. Swotinsky also noted that with respect to DeCesare's depression, Dr. Wang had stated that DeCesare had started taking Cymbalta in May 2011 and that "[t]here [were] no medical records describing evaluation and treatment of [DeCesare's] depression and thus the documentation [had] insufficient information to corroborate the diagnosis and its related limitations." (Defs.' 56.1 ¶¶ 160–61; Bell Decl. 1092.) In sum, Dr. Swotinsky stated that:

> The claimant's spinal stenosis is limiting, perhaps limiting to no more than sedentary activity. This would preclude him from doing his usual job, which has medium physical demand requirements. The claimant's knee condition is likewise limiting, but . . . would not preclude him from sedentary work. The claimant is opioid dependent, but this should not impact his work capacity. His diabetes likewise does not affect is work capacity.

(Defs.' 56.1 ¶ 162; Bell Decl. 1092.) Dr. Swotinsky also noted that:

> There is no documentation of medication-related impairment. Dr. Dobrow's notes repeatedly state the claimant is not impaired from his medicines. The claimant drives, which suggests he feels himself capable of this cognitively demanding task. In general, with long-term use of opioid narcotics, patients become acclimated to potential side effects. Such use is rarely disqualifying from employment and there is no evidence indicating that it should be.

(Defs.' 56.1 ¶ 165; Bell Decl. 1093.)

Studenroth reviewed DeCesare's updated clinical records and Dr. Swotinsky's report and stated that the report found DeCesare to be functional at the sedentary physical demand level. (Defs.' 56.1 ¶ 166; Bell Decl. 669.) Studenroth referred DeCesare's claim back to Wiers with the recommendation that she send Dr. Swotinsky's report to DeCesare's treating physicians and request comment. (Defs.' 56.1 ¶ 168; Bell Decl. 669.)

22

Aetna requested that Dr. Wang and Dr. Dobrow indicate whether they agreed that DeCesare was functionally able to work at a sedentary job, and if they disagreed to provide a clinical narrative and any current clinical findings to support their respective opinions.  (Defs.' 56.1 ¶ 169; Bell Decl. 463, 478.)  In his response, Dr. Wang indicated that he did not agree DeCesare was capable of performing sedentary work on a full time basis, and on July 5, 2011 he completed a Capabilities and Limitations Worksheet, in which he claimed DeCesare was capable of working zero hours per day, but did not submit any clinical findings to support his opinions. (Defs.' 56.1 ¶¶ 170–72; Bell Decl. 1239, 1241.)

On July 13, 2011, Wiers spoke with DeCesare for a status update in light of the Test Change Date.  (Defs.' 56.1 ¶ 173; Bell Decl. 677–679.)  Wiers informed DeCesare that based on his review of the clinical evidence in his medical records, Dr. Swotinsky had opined that DeCesare could perform full-time sedentary work.  (Defs.' 56.1 ¶ 174; Bell Decl. 679.) DeCesare responded that he could not perform sedentary work due to his pain, did not believe he could work for that long, and stated that during any given day he is often forced to lie down and sometimes the pain stops him from doing anything.  (Defs.' 56.1 ¶¶ 176–77; Bell Decl. 679.) Wiers also informed DeCesare that she sent a copy of Dr. Swotinsky's report to Dr. Dobrow and Dr. Wang, she was still waiting for Dr. Dobrow's response, and while Dr. Wang opined that DeCesare could not perform sedentary work, he did not produce any clinical evidence to support his opinion.  (Defs.' 56.1 ¶¶ 175, 178; Bell Decl. 679.)

By letter dated July 14, 2011, Dr. Wang further advised that:

DeCesare cannot sit or stand for any length of time without having to change positions or lie down to relieve the pain.  The condition varies but remains

23

> consistent.   Mr. DeCesare is not able to return to work in either his past
> occupation or any other occupation sitting or standing given this condition.  He is
> totally disabled physically.

(Defs.' 56.1 ¶ 179; Bell Decl. 1100.)  Dr. Wang did not, however, provide any clinical proof to

support his opinion.  (Defs.' 56.1 ¶ 180.)  On July 19, 2011, DeCesare contacted Aetna and

indicated that Dr. Wang informed him that he would be submitting clinical proof to support his

opinions.  (Defs.' 56.1 ¶ 181; Bell Decl. 682.)  By letter dated July 25, 2011 Dr. Dobrow

responded to Aetna's request by stating that DeCesare was not able to return to work and that he

"ha[d] difficulty sitting and standing for long periods of time due to his pain," but did not submit

any clinical findings to support his opinions.  (Defs.' 56.1 ¶¶ 182–83; Bell Decl. 1095.)

On August 1, 2011, Wiers stated that she discussed DeCesare's case with her team leader

and a doctor from Aetna and they determined that an Independent Medical Examination ("IME")

was warranted to determine DeCesare's then-current level of functional capacity.  (Defs.' 56.1

¶ 184; Bell Decl. 694–95.)  In August 2011, Wiers requested that UNIVAL, Inc. retain a

physician specializing in Occupational Medicine to perform an IME on DeCesare.  (Defs.' 56.1

¶ 183; Bell Decl. 695.)  On September 29, 2011, Dr. Karen Garvey, MD, MPH, ("Dr. Garvey") a

physician who is Board Certified in Occupational Medicine, examined DeCesare at Cornerstone

Medical and Wellness, LLC in Millburn, New Jersey.  (Defs.' 56.1 ¶ 186; Bell Decl. 814.)  Dr.

Garvey also reviewed DeCesare's medical records and obtained additional history and

information from DeCesare prior to conducting her examination and issuing her report.  (Defs.'

56.1 ¶ 187; Bell Decl. 814–16.)  According to Dr. Garvey in her report dated October 6, 2011:

> Mr. DeCesare lists his daily activity as the following: he is able to maintain his
> own daily hygiene with bathing and dressing himself.  He requires his wife to

help him with putting on his shoes, for which he has switched to loafers and slip on shoes instead of laced shoes.  He states that after breakfast he sits at his computer only for intervals of 15 minutes at a time without standing.  He then goes to the living room and sits on the couch to watch television.  He can walk behind his wife who uses a push mower to cut the lawn for short periods.  He can drive short distances, usually about 15 minutes.  His prior hobbies included playing the guitar both electric and regular and drums.  He is no longer able to play the drums or the electric guitar, but can play the regular guitar, which he can only do for 15 minutes due to the back pain.  Based on Mr. DeCesare's amount of his activity of daily living his wife does all the maintenance of the dog, house[,] and yard activities.  He mentioned that he is on the computer several times during the conversation.  When I mentioned to him that he frequently mentioned being on the computer, and inquired if he was employed, he stated [he was] only on the computer to keep updated, to get emails[,] and to listen to the National Public Broadcasting.  He state[d] that he occasionally drives locally.

(Defs.' 56.1 ¶ 188; Bell Decl. 816–17.)

Dr. Garvey also stated that:

It is my clinical impression that Mr. DeCesare has a degree of back pain and symptom magnification as reported on the pain disability questionnaire.  The extent of the objective medical examination reveals no evidence of muscle strength or radicular deficiencies in the sensory distributions of the lower extremity L1-L5 on either the right or left leg.  The increased sensation to pin prick L1-L2 is inconsistent with the distribution of surgery L3-L4 and L4-L5.  The objective findings of fullness on the left paraspinal area are more consistent with local muscular strain and are without radicular symptoms or physical limitations on the examination.  Mr. DeCesare was able to sit for a consistent 30 minutes, stand and step up to the exam table without difficulty.  Based on my medical evaluation it is my clinical judgment that Mr. DeCesare is capable of working a sedentary job.

(Defs.' 56.1 ¶ 189; Bell Decl. 818.)  Dr. Garvey further noted that "there is a large subjective component to the medical documentation" and that DeCesare's "use of the back brace support and ambulation with the cane are self-directed and physical examination findings support no evidence of back or leg weakness or instability requiring the medical directed use of assistive devices."  (Defs.' 56.1 ¶ 190; Bell Decl. 818.)  She also advised that "the extent of the

dependence of narcotic medications would preclude prolonged sitting throughout a normal 8-hour workday" and recommended " a workday of 4 hours per day with a 10-15 minute break after sitting 1.5 to 2 hours" as a "permanent accommodation." (Defs.' 56.1 ¶ 191; Bell Decl. 819.) Moreover, she opined that "although Mr. DeCesare may have back pain there is no clinical evidence from the review of medical records or [her] clinical evaluation that preclude[d] him from performing work in a sedentary position" and that subjective complaints and the self-assessed severe disability score of 130 on the pain disability questionnaire were inconsistent with the extent of function during the medical evaluation and in her opinion there was "symptom magnification." (Defs.' 56.1 ¶¶ 192–93; Bell Decl. 819.) In the Employment and Impairment Summary Form completed on September 29, 2011, Dr. Garvey indicated that DeCesare would be able to return to work on November 1, 2011. (Defs.' 56.1 ¶ 194.)[7]

On August 3, 2011, Wiers stated that DeCesare's claim was being referred to Aetna's CCIU to conduct surveillance on DeCesare to determine whether his reported functional restrictions/limitations were supported because: (1) DeCesare's treating physicians failed to provide any clinical proof to support their disagreement with Dr. Swotinsky's opinion that DeCesare's medical records did not demonstrate that he was unable to perform sedentary work; and (2) Dr. Dobrow previously stated that DeCesare's medical condition did not interfere with his ability to work. (Defs.' 56.1 ¶ 195; Bell Decl. 697–94.) On August 4, 2011, Wiers referred DeCesare's claim file back to Kili in Aetna's CCIU and Kili requested that Research Consultants

---

[7] Defendants do not provide a citation for this statement in their Rule 56.1 Statement. Plaintiff does not, however, contest this fact. In any event, it is not material to the resolution of the instant Motion.

Group, Inc. ("RCG") conduct three days of surveillance on DeCesare beginning on September 19, 2011.  (Defs.' 56.1 ¶¶ 196–97; Bell Decl. 704–05, 1192–1202.)  After acquiring approximately 1 hour and 35 seconds of video footage of DeCesare outside of his residence, RCG advised that "we observed the claimant walking without any ambulatory aides to help him in his activities on the first day" and "[o]n the second day we observed the claimant using a cane and back brace."  (Defs.' 56.1 ¶¶ 199–200; Bell Decl. 1192.)  The second day of surveillance was conducted on DeCesare's scheduled IME.  (Defs.' 56.1 ¶ 201; Bell Decl. 1192, 1199–1201.)  On the third day of surveillance, RCG reported that DeCesare "did not make an appearance outside of his residence," and a "discreet inquiry was utilized[, allowing RCG] to confirm his presence inside the home[, and thus they] remained on site."  (Defs.' 56.1 ¶¶ 202–03; Bell Decl. 1192.)  In its report, RCG noted that it had observed DeCesare engaging in various activities, including, among other things, driving less than ten minutes to various locations, stepping out of his house to the porch, sitting on a chair while smoking a cigarette, walking across the lawn and then entering the art studio on his property after walking up the stairs to the second floor, pruning a bush in front of his residence, pulling an object tangled in the branches, picking up a large decorative wagon wheel and carrying it with his left arm to the fence at the side of the property, and existing the house carrying a cane that he used to help him walk.  (Defs.' 56.1 ¶ 204; Bell Decl. 1194–99.)  Following a review of the surveillance report, Kili stated that the activity observed was inconsistent with DeCesare's claimed functional restrictions/limitations, and that while DeCesare was observed using his cane and back brace on the day of his IME, he appeared to move with no apparent difficulties on the day before the IME.  (Defs.' 56.1 ¶¶ 205–06.)

Kili sent Dr. Garvey the surveillance footage for her review and comment, and Dr. Garvey issued a supplemental report dated November 8, 2011 after reviewing RCG's materials. (Defs.' 56.1 ¶¶ 207–08; Bell Decl. 728, 821–23.)  In the supplemental report, Dr. Garvey described instances in which DeCesare was observed on the surveillance video walking without difficulty and without the use of a back support belt or other assistive device throughout the day on September 28, 2011, and was engaging in bending and lifting actions on several occasions. (Defs.' 56.1 ¶¶ 209–10; Bell Decl. 821–22.)  She also commented that there was a contrast in DeCesare's gait observed on September 28, 2011, the day of the IME, and the preceding day. (Defs.' 56.1 211; Bell Decl. 822.)  Dr. Garvey noted that "[f]rom [her] initial report [she] concluded that there was a degree of symptom magnification, which [was] confirmed with these new observed findings on the surveillance information and an absence of physical limitation or impairment."  (Defs.' 56.1 ¶ 212; Bell Decl. 823.)  She concluded that:

> [A]lthough DeCesare may have symptoms of back pain as evidenced by his holding his left back on two occasions, it appears that there is no impairment of his ability to perform activities such as walking, sitting, bending, twisting, reaching, pushing, pulling, grasping[,] or lifting [and thus] there is no indication for the permanent part-work restriction previously stated in [her] October 8, 2011 report [but rather, she concluded] that . . . DeCesare [was] able to perform normal work activities, full duty, for an 8-hour workday with no restrictions.

(Defs.' 56.1 ¶ 213; Bell Decl. 823.)

In a letter dated October 20, 2011, Aetna advised DeCesare that it was continuing to evaluate his "ability to perform another occupation," to determine his continued eligibility for benefits, and that his monthly benefits would continue until Aetna's investigations were concluded.  (Defs.' 56.1 ¶ 214; Bell Decl. 503.)

By letter dated November 1, 2011, DeCesare's counsel, Barbara Matarazzo ("Matarazzo") provided additional medical records for Aetna's review and consideration, specifically a letter from Dr. Wang dated October 31, 2011 and a letter from Dr. Dobrow, dated October 28, 2011, which Matarazzo claimed "outline[d] the restrictions and limitations that render Mr. DeCesare totally disabled and unable to perform the basic function of daily living due to pain." (Defs.' 56.1 ¶¶ 216–17; Bell Decl. 1209–1212.) In Dr. Wang's letter, he opined that DeCesare was "totally disabled" and recounted DeCesare's clinical history and symptoms to substantiate his opinion. (Defs.' 56.1 ¶ 218; Bell Decl. 1210–11.) Specifically, Dr. Wang stated that:

> The chronic pain remains the largest stumbling block for him even now. He can no longer put on clothes in the morning with[]out assistance from his wife. Once dressed it takes 20 minutes to ¾ of an hour to begin to feel relief after taking any pain medication. After the medication begins to take effect he is still limited to only being able to sit for very short periods of time before he needs to stand and stretch out his back and assume another position.

(Defs.' 56.1 ¶ 219; Bell Decl. 1210.) In Dr. Dobrow's letter, he opined that based on DeCesare's subjective complaints of pain, he was "unable to work due to the injury in his lumbar spine." (Defs.' 56.1 ¶ 220; Bell Decl. 1212.) Neither doctor provided any clinical evidence or diagnostic tests to support his opinion. (Defs.' 56.1 ¶ 221.) On November 29, 2011, Aetna forwarded Dr. Garvey's supplemental report and the surveillance footage to Dr. Wang and Dr. Dobrow for review and comment. (Defs.' 56.1 ¶ 222; Bell Decl. 737–38.)

On or about December 23, 2011, Lori Karickhoff ("Karickhoff") performed an "Own Occupation Comparison," and concluded that DeCesare's occupation of Creative Director of Marketing in the economy was considered a light physical demand job, and that DeCesare had

the functional physical capacity to perform his own occupation.  (Defs.' 56.1 ¶ 223; Bell Decl. 741.)

Aetna did not receive any response from Dr. Wang or Dr. Dobrow regarding Dr. Garvey's supplemental IME report and the surveillance footage.  (Defs.' 56.1 ¶ 224.)  Kili determined that DeCesare's claim for continuing LTD benefits should be terminated effective January 9, 2012, of which her supervisor approved.  (*Id.*; Bell Decl. 746.)  By letter dated January 9, 2012, Aetna advised DeCesare that his claim for continuing LTD benefits would be terminated that day (the "Denial").  (Defs.' 56.1 ¶ 225; Bell Decl. 1978.)  The letter explained that "[t]he medical documentation in [DeCesare's] claim file does not support his inability to perform work at his own occupation as an AVP Creative Director of Marketing on a full time basis in a light physical demand capacity[,]" and detailed the information Aetna reviewed in making its determination, which included information provided by DeCesare's physicians. (Defs.' 56.1 ¶¶ 227–28; Bell Decl. 1978–84.)  Aetna also informed DeCesare that the fact that he was receiving SSDI benefits was given "little weight in [its] determination of whether he [was] eligible for LTD benefits," because of Aetna's conclusion that DeCesare was "no longer disabled based on the Plan's definition of Totally Disabled."  (Defs.' 56.1 ¶ 229; Bell Decl. 1985.)  The letter advised DeCesare of his appeal rights and invited him to submit "medical information which support[ed] restrictions and limitations which would preclude [him] from performing any occupation as required by the policy."  (Defs.' 56.1 ¶ 230; Bell Decl. 1985.)  Moreover, the Denial stated that DeCesare must mail or deliver a written request for review within 180 days of receipt of the letter.  (Defs.' 56.1 ¶ 231; Bell Decl. 1985.)

30

### 4.  DeCesare's Administrative Appeal

By letter dated May 3, 2012, DeCesare, through his counsel, appealed Aetna's initial adverse benefit determination.  (Defs.' 56.1 ¶ 232; Bell Decl. 1078–1085.)  In the appeal letter, DeCesare objected to the Denial on the grounds that it was "inconceivable that a denial would be made based upon a 40 minute one visit analysis with [Aetna's] IME, and a 100 minute video, as opposed to doctors who are intimately familiar with Mr. DeCesare for a combined 18 years." (Defs.' 56.1 ¶ 233; Bell Decl. 1078.)  Moreover, DeCesare listed several examples from the video surveillance to show that he could not perform the tasks necessary to work 8-hour days. (Defs.' 56.1 ¶ 238; Bell Decl. 1082–84.)  DeCesare disputed that his job was a "light physical demand" job, and argued that Dr. Swotinsky's conclusion that DeCesare was "at leas[t] [at] sedentary work capacity," supported DeCesare's claim that he could not perform his own occupation.  (Defs.' 56.1 ¶¶ 234–36; Bell Decl. 1079–80.)  Moreover, DeCesare contended that his disability claim should be evaluated based on the "combination of [his] back condition, the loss of strength in both [of his] knees, the torn meniscus, the degenerative end plate changes, the stenosis, as well as [his] dependence on opioid narcotics medications in an attempt to control the pain."  (Defs.' 56.1 ¶ 237; Bell Decl. 1080–81.)

In support of his appeal, DeCesare enclosed additional letters from Dr. Wang and Dr. Dobrow.  (Defs.' 56.1 ¶ 239; Bell Decl. 1127–31.)  In a letter dated April 2, 2012, Dr. Wang stated that "[a]fter a close and thorough review of [the] surveillance video and subsequent doctor findings, I find that both you and your doctors [sic] findings show no evidence in the video that would indicate to me that Mr. DeCesare has the capability to return to work or [perform] any

job" and that he "totally disagree[d] with [Aetna's] determination based solely on the evidence provided." (Defs.' 56.1 ¶ 240; Bell Decl. 1127.)  In his letter dated April 27, 2012, Dr. Dobrow concluded that DeCesare was totally disabled and could not perform the necessary functions to work and disputed the conclusions reached by Dr. Garvey, stating that he believed DeCesare was not capable of performing his duties at work due to his pain, his job was not a sedentary job, and there were numerous activities in his job that he could not perform. (Defs.' 56.1 ¶¶ 241, 244; Bell Decl. 1129, 1131.)  Dr. Dobrow further stated that that DeCesare "require[d] opioid medications which [a]ffect[] his ability to concentrate and perform work related activities," and pointed to the surveillance video to illustrate that DeCesare had pain and difficulty performing certain activities. (Defs.' 56.1 ¶¶ 242–43; Bell Decl. 1129–30.)

After reviewing DeCesare's appeal, Aetna concluded that it would refer the claim for a new independent medical record peer review. (Defs.' 56.1 ¶ 245; Bell Decl. 759–60.)  By letter dated May 7, 2012, Aetna advised DeCesare's lawyer that it would issue a decision on the appeal within 45 days of the appeal request. (Defs.' 56.1 ¶ 246; Bell Decl. 508.)  In a subsequent letter to DeCesare's counsel dated June 15, 2012, Aetna indicated that it had referred DeCesare's medical records to an independent physician peer review consultant for evaluation and was awaiting his medical opinion and, accordingly, required a thirty-day extension to complete the review of the appeal. (Defs.' 56.1 ¶¶ 247–48; Bell Decl. 509.)

On or about June 18, 2012, Aetna Senior Technical Specialist Julia Bell ("Bell") sought a peer review of DeCesare's case from a physician specializing in pain management. (Defs.' 56.1 ¶ 249; Bell Decl. 767, 804–09.)  Third-party independent medical record peer review vendor

MES Solutions retained Dr. William Lichtenfeld, M.D, ("Dr. Lichtenfeld") Board Certified in

Physical Medicine & Rehabilitation, with a Subspecialty Certificate in Pain Medicine, to perform

the review.  (Defs.' 56.1 ¶ 250; Bell Decl. 804–09.)  Dr. Lichtenfeld reviewed DeCesare's

clinical records, spoke to Dr. Wang, and unsuccessfully attempted on multiple occasions to speak

with Dr. Dobrow.  (Defs.' 56.1 ¶¶ 251–52; Bell Decl. 804–05, 807.)  During the conversation,

Dr. Wang stated that DeCesare was limited in "his ability to bend, walk, stand, or sit for greater

than [two hours] total per day[,]" he could not work for eight hours per day, and he was totally

disabled.  (Defs.' 56.1 ¶ 253; Bell Decl. 807.)  Dr. Lichtenfeld reported that the notes from

DeCesare's physicians "fail[ed] to document any significant physical examination findings at

all[, including] range of motion deficits, weakness, decreased sensation, or deep tendon

reflexes."  (Defs.' 56.1 ¶ 254; Bell Decl. 807.)  Dr. Lichtenfeld opined that "[b]ased on the

provided documentation, the physical demand level of work [DeCesare could] likely perform

[was] Medium Level work from 1/10/12 through 6/30/12" and that "the restrictions and/or

limitations imposed by the treating physicians [were] not appropriate" because they did not

include any significant physical examination findings.  (Defs.' 56.1 ¶¶ 255–56; Bell Decl. 807.)

Accordingly, Dr. Lichtenfeld concluded that the documentation failed to support functional

impairment for the entire time frame DeCesare had received benefits.  (Defs.' 56.1 ¶ 257; Bell

Decl. 807–08.)

        By letters dated August 1, 2012 and August 3, 2012, Aetna advised DeCesare that his

appeal was suspended until August 23, 2012 to allow for a discussion between Dr. Dobrow and

Dr. Lichtenfeld.  (Defs.' 56.1 ¶¶ 261–62; Bell Decl. 515–16.)  Despite numerous attempts, Dr. Lichtenfeld never spoke with Dr. Dobrow.  (Defs.' 56.1 ¶ 263; Bell Decl. 792–93.)

By letter dated August 24, 2012, Bell notified DeCesare that the appeal review process had been completed and the Denial was upheld.  (Defs.' 56.1 ¶ 264; Bell Decl. 518–21.)  Bell stated that Aetna had "determined that there remain[ed] a lack of medical evidence to support Mr. DeCesare's inability to perform work at any reasonable occupation as of January 10, 2012," and there was "no evidence of any significant physical examination findings at all."  (Defs.' 56.1 ¶¶ 265–66; Bell Decl. 520.)  Furthermore, Bell noted that DeCesare's claim that his work would be affected by his medication was not supported by evidence.  (Defs.' 56.1 ¶ 268; Bell Decl. 521.)  Bell's letter referenced Dr. Lichtenfeld's opinion and Dr. Garvey's supplemental IME report.  (Defs.' 56.1 ¶¶ 269–71; Bell Decl. 520.)  Finally, Bell advised that if DeCesare disagreed with Aetna's final appeal determination, he could bring a civil action under Section 502(a) of ERISA.  (Defs.' 56.1 ¶ 272; Bell Decl. 521.)

B.  Procedural History

Plaintiff filed his initial Complaint on September 24, 2012.  (Dkt. No. 1.)  Plaintiff filed the instant Amended Complaint on December 19, 2012, alleging that Defendants violated 29 U.S.C. § 1132(a)(1)(B), by denying DeCesare benefits due to him under the terms of the Plan and 29 U.S.C. § 1133, by failing to provide the necessary information required for adequate notice.  (Am. Compl. ¶¶ 24, 29 (Dkt. No. 7).)  Plaintiff seeks benefits under the terms of the Plan, a clarification of his future rights under the terms of the Plan, a declaratory judgment that Plaintiff is totally and permanently disabled under the terms of the Plan, a declaration that there

34

is a waiver of premiums from the date of Plaintiff's total disability, and attorney's fees.  (*Id.*

¶¶ 29–32.)  Pursuant to a Scheduling Order so ordered by the Court on June 2, 2014, (Dkt. No.

32), Defendants filed the instant Motion and accompanying papers on July 11, 2014.  (Dkt. Nos.

35–40.)  Plaintiff filed his opposition papers on July 30, 2014, (Dkt. Nos. 41–42), and

Defendants filed their reply and a supporting declaration on August 25, 2014, (Dkt. Nos. 43–44).

## II.  DISCUSSION

### A.  Applicable Law

#### 1.  Standard of Review for Summary Judgment

Summary judgment shall be granted where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper*

*Saddle River, N.J. v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014)

(same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute

exists."  *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see*

*also Aurora Commercial Corp. v. Approved Funding Corp.,* No. 13-CV-230, 2014 WL 1386633,

at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on

the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go

to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a genuine issue for trial," *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis and internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

      "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod,* 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab.*

36

*Litig.*, MDL No. 1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).

Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva*

*Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation

marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)); *see also*

*Schatzki v. Weiser Capital Mgmt., LLC*, No. 10-CV-4685, 2013 WL 6189465, at *14 (S.D.N.Y.

Nov. 26, 2013) (same).

## 2.  Benefits Claim Under ERISA

Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) of ERISA provides that a "civil action

may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the

terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future

benefits under the terms of the plan."  Section 503(2) of ERISA, 29 U.S.C. § 1133, in turn,

"requires that claims for benefits be afforded a 'full and fair review by the appropriate named

fiduciary of the decision denying the claim.'"  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 86

(2d Cir. 2009) (quoting 29 U.S.C. § 1133(2)).  Courts "have defined a 'full and fair review' to

mean 'knowing what evidence the decision-maker relied upon, having an opportunity to address

the accuracy and reliability of the evidence, and having the decision-maker consider the evidence

presented by both parties prior to reaching and rendering [its] decision.'"  *Cejaj v. Bldg. Serv.*

*32B-J Health Fund*, No. 02-CV-6141, 2004 WL 414834, at *7 (S.D.N.Y. Mar. 5, 2004) (quoting

*Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 598 (5th Cir. 1994)).  The purpose of the

full and fair review requirement is to provide the claimant with enough information to challenge

the decision in federal court.  *See Juliano v. Health Maintenance Org. of N. J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000).

The plaintiff "has the burden of proving by a preponderance of the evidence that he is totally disabled within the meaning of the plan."  *Paese v. Hartford Life and Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006) (internal quotation marks omitted); *see also Barbu v. Life Ins. Co. of N. Am.*, 35 F. Supp. 3d 274, 288 (E.D.N.Y. 2014) (same); *Aitkins ex rel. Casillas v. Park Place Entm't Corp.*, No. 06-CV-4814, 2008 WL 820040, at *13 (E.D.N.Y. Mar. 25, 2008) (same).  The "question of whether or not a claimant is disabled must be judged according to the terms of the policy."  *VanWright v. First Unum Life Ins. Co.*, 740 F. Supp. 2d 397, 402 (S.D.N.Y. 2010).  Moreover it is "reasonable for [the plan administrator] to require objective evidence to support [a claimant's] alleged physical limitations."  *Ianniello v. Hartford Life & Accident Ins. Co.*, 10-CV-370, 2012 WL 314872, at *3 (E.D.N.Y. Feb. 1, 2012); *accord Hobson*, 574 F.3d at 88 (holding that "it is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability . . . . and it is not unreasonable for a plan administrator to require such evidence so long as the claimant was so notified").

A court reviews "a plan administrator's decision de novo unless the plan vests the administrator with 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case [a court] use[s] an 'abuse of discretion' standard."  *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 108 (2d Cir. 2005) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  The Second Circuit has held that "in cases in which an

38

abuse of discretion standard of review applies, because 'written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, [a court] will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious.'" *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 130 (2d Cir. 2008) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)).   Under this standard, "[a] court may overturn a plan administrator's decision to deny benefits only if the decision was without reason, unsupported by substantial evidence[,] or erroneous as a matter of law." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (internal quotation marks omitted).   "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 109 (internal quotation marks omitted); *see also McCauley*, 551 F.3d at 130 (same).   "[A] plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make de novo review appropriate." *McCauley*, 551 F.3d at 133 (italics omitted).   However, if both the claim administrator and a claimant "offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control." *Id.* at 132 (internal quotation marks omitted).   But, "where the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be

found to be arbitrary and capricious." *O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 112 (2d Cir. 1995) (internal quotation marks omitted).

Finally, in reviewing a claim for benefits under ERISA, "a district court's review under the arbitrary and capricious standard is limited to the administrative record," *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995); *see also Novick v. Metro. Life Ins. Co.*, 914 F. Supp. 2d 507, 521 (S.D.N.Y. 2012) (same); *Aitkins ex el. Casillas v. Park Place Enter. Corp.*, No. 06-CV-4814, 2008 WL 820040, at *12 (E.D.N.Y. Mar. 25, 2008) (same), unless the plan administrator is not "disinterested," in which case a district court may admit additional evidence only if good cause exists, *Paese*, 449 F.3d at 441; *cf. Aitkins*, 2008 WL 820040, at *12 (explaining that "[t]he legal standard for considering evidence outside the administrative record depends on the standard of review to be applied to the claim" and that "[f]or a de novo review of the administrator's decision, 'the district court ought not to accept additional evidence absent good cause.'" (quoting *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 646 (2d Cir. 2002)).

B.  Analysis

1.  Standard of Review and Documents Considered

The Court reviews Aetna's denial of LTD benefits under the arbitrary and capricious standard because the Plan grants Aetna "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of [t]he Policy."  (Bell Decl. 27.) *See Jennison v. Hartford Life & Accident Ins. Co.*, No. 10-CV-164, 2011 WL 3352449, at *5 (N.D.N.Y. Aug. 3, 2011) (concluding that similar language required the court to apply the arbitrary and capricious standard to a denial of benefits claim); *Geiger v. Alstom Signaling Inc.*,

No. 06-CV-6561, 2010 WL 1509343, at *13 (W.D.N.Y. Apr. 14, 2010) (same); *Winter v.*

*Hartford Life & Accident Ins. Co.*, 309 F. Supp. 2d 409, 414 (E.D.N.Y. 2004) (same).  Moreover,

Plaintiff does not contest that the arbitrary and capricious standard of review is appropriate.  (*See*

Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") 14 (Dkt. No. 42); Defs.'

Reply Mem. of Law in Supp. of Their Mot. for Summ. J. ("Defs.' Reply") 2 n.4 (Dkt. No. 43).)

*See Novella v. Westchester Cnty.*, 661 F.3d 128, 140 (2d Cir. 2011) (addressing the defendants'

interpretation of the Plan under the arbitrary and capricious standard because "in their

briefing . . . the parties appear to agree that the arbitrary-and-capricious standard applie[d] in

th[e] case").

    Although Plaintiff submits several exhibits with his opposition papers, the Court does not

consider them because generally "a district court's review under the arbitrary and capricious

standard is limited to the administrative record," *Miller*, 72 F.3d at 1071, and Plaintiff has not

explained why good cause exists to consider these documents, *Paese*, 449 F.3d at 441.  In any

event, most of the documents that Plaintiff submits are in the administrative record and would

not change the outcome of this Opinion.

### 2.  Denial of Benefits

    After a review of the administrative record, the Court finds that Aetna's decision to

terminate Plaintiff's LTD benefits was not arbitrary and capricious.  In the Denial, Aetna listed

all of the information that was considered to conclude that DeCesare did not meet the Plan's

definition of disability, including DeCesare's medical records, PT reports from St. Anthony's,

documents, office notes, and letters from Dr. Hoverman, Dr. Wang, and Dr. Dobrow, Dr.

Swotinsky's report, Dr. Garvey's report, Karickhoff's Own Occupation Comparison report, the video surveillance and report, and letters from DeCesare's counsel.  (Bell Decl. 1978–79.) Based on this information, Aetna concluded that DeCesare's occupation of AVP Creative Director of Marketing was a "light physical demand occupation," and "[t]he medical documentation in [DeCesare's] claim file [did] not support his inability [to] perform work at his own occupation as a[n] AVP Creative Director of Marketing on a full time basis in a light physical demand capacity."  (*Id.* at 1981, 1984.)  Similarly, in its letter denying Plaintiff's appeal, Aetna explained that "there remain[ed] a lack of medical evidence to support Mr. DeCesare's inability to perform work at any reasonable occupation as of January 10, 2012," that there was "no evidence of any significant physical examination findings at all," and that DeCesare's claim that his work would be affected by his medication was not supported by evidence.  (*Id.* at 518–20.)  The letter further stated that Defendants relied on Dr. Lichtenfeld's opinion and Dr. Garvey's supplemental IME report.  (*Id.* at 520.)  Despite DeCesare's failure to submit objective medical evidence to support his claim for disability, and the review of his condition by three doctors retained by Aetna, Plaintiff argues that the denial of LTD benefits was arbitrary and capricious for the following reasons, none of which has merit.

### a.  The Plan's Definition of Disability

To the extent Plaintiff claims that Aetna acted in an arbitrary and capricious manner by interpreting the Plan's "any reasonable occupation" disability definition to mean "any gainful occupation," this argument is rejected.  (Pl.'s Mem. 5.)  In the letter dated December 29, 2010, Wiers explained that "[a]fter the first 24 months that any [m]onthly [b]enefit is payable during a

period of disability, you will be deemed to be disabled on any day if you are not able to work at any reasonable occupation solely because of . . . disease[] or . . . injury." (Bell. Decl. 418.) Wiers then explained, in the same letter, that "to be entitled to LTD benefits after [the first 24-month period applicable to your claim], you must be considered disabled from performing any gainful occupation," (*id.*), a term that Plaintiff states is "not found anywhere in the policy," (Pl.'s Mem. 5). Wiers also lists several criteria that Aetna would consider at the end of the 24-month period in evaluating DeCesare's ability to perform another occupation, including DeCesare's medical condition and how it may limit his ability to work, the skills and knowledge he had gained from his education and past work experience, his prior occupations, and jobs that he could perform based on his vocational and physical abilities, (Bell Decl. 418–19), which Plaintiff also complains are "criteria [that are] nowhere in the policy," (Pl.'s Mem. 5).

According to the terms of the Plan, Aetna has the "discretionary authority to . . . construe any disputed or doubtful terms of th[e] policy." (Bell Decl. 44.) As the Second Circuit has held, if both the claim administrator and a claimant "offer rational, though conflicting interpretations of plan provisions, the administrator's interpretation must be allowed to control," *McCauley*, 551 F.3d at 132 (internal quotation marks omitted), unless the interpretation "impose[s] a standard not required by the plan's provision, or interpret[s] the plan in a manner inconsistent with its plain words or . . . [to] render some provisions of the plan superfluous," *O'Shea*, 55 F.3d at 112 (internal quotation marks omitted). Here, Plaintiff does not explain how "any gainful occupation" is inconsistent with or renders the phrase "any reasonable occupation" superfluous. Moreover, the criteria that Wiers listed for evaluating "any reasonable occupation" does not

43

"impose a standard not required" by the Plan, but rather clarifies the factors Aetna uses to determine whether a claimant may or may not work at a reasonable occupation. Accordingly, the Plan's interpretation of "any reasonable occupation" controls. In any event, the Denial was ultimately based on Defendants' conclusion that DeCesare was able to work at his own occupation, not any reasonable occupation. (Bell Decl. 1978.)[8]

<b>b. Light Physical Demand Occupation</b>

The Court rejects Plaintiff's claim that Aetna's classification of DeCesare's occupation as a "light physical demand occupation" was unreasonable. (Pl.'s Mem. 12.) The Second Circuit has held that where a plan does not define the term "regular occupation," "the applicable definition of regular occupation shall be a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) (internal quotation marks omitted); *see also Shore v. Painewebber Long Term Disability Plan*, No. 04-CV-4152, 2007 WL

---

[8] The Court notes that by January 9, 2012, the date of the Denial, it is clear that the "any reasonable occupation" standard applied to DeCesare's claim. The Plan states that "[f]rom the date that you first become disabled and until [m]onthly [b]enefits are payable for 24 months, you will be deemed to be disabled on any day if[] you are not able to perform the material duties of *your own occupation* solely because of[] disease or injury . . . . ." (Bell. Decl. 101 (emphasis added).) But, "[a]fter the first 24 months that [m]onthly [b]enefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at *any reasonable occupation* solely because of[] disease[] or injury. (*Id.* (emphasis added).) According to the Plan, then, DeCesare would have been disabled only under the "any reasonable occupation" standard beginning on March 30, 2011, 24-months after his surgery date. By letter dated December 29, 2010, however, Aetna advised DeCesare that the "own occupation" disability period would end on June 27, 2011. (*Id.* at 418–19.) In any event, by January 9, 2012, the date of the Denial, DeCesare's claim was eligible to be evaluated under the "any reasonable occupation" standard. Although it is not clear why Aetna did not apply this standard, the Court does not find that this issue is material to DeCesare's claim here. Clearly, DeCesare's "own

3047113, at *12 (S.D.N.Y. Oct. 15, 2007) (same).  Accordingly, courts have relied on "the

standard articulated . . . in *Kinstler*" when a plan does not define the term under which it should

evaluate a plaintiff's occupation.  *Peck v. Aetna Life Ins. Co.*, 495 F. Supp. 2d 271, 277 (D.

Conn. 2007) (applying *Kinstler* to a policy that did not define the term "own occupation"); *see*

*also Painewebber*, 2007 WL 3047113, at *12 (applying *Kinstler* to a policy that did not define

"regular occupation").  This standard requires, among other things, that the plan administrators

give "some consideration of the nature of the institution where [the claimant] was employed."

*Kinstler*, 181 F.3d at 253.  In evaluating plan denials under this standard, courts have found a

plan administrator's decision arbitrary when it relied solely on the Dictionary of Occupational

Titles ("DOT"), without considering a plaintiff's actual job duties at his or her place of

employment.  *See Mead v. ReliaStar Life Ins. Co.*, 755 F. Supp. 2d 515, 532 (D. Vt. 2010)

(finding that "[t]he conclusion that seven marketing positions in the national economy involving

ten percent or less of travel were comparable to [the plaintiff's] position, when the undisputed

evidence was that [the plaintiff] traveled up to thirty percent of [the] time . . . was without reason

and unsupported by the evidence"); *Painewebber*, 2007 WL 3047113, at *13 (holding that the

defendants' failure to consider the plaintiff's actual duties in evaluating her "regular occupation"

was arbitrary and capricious), *appeal dismissed*, 768 F.3d 102 (2d Cir. 2014); *Peck*, 465 F. Supp.

2d at 277 (holding that the plan's sole reliance on the DOT and failure "to contradict, or even

acknowledge, [the plaintiff's] evidence that she could not perform the material duties of her own

occupation" was arbitrary and capricious).

---

occupation" would fit within any definition of "any reasonable occupation."

In contrast, here the Plan defines a claimant's "own occupation" as "[y]our occupation will be viewed as it is normally performed in the national economy instead of how it is performed."  (Bell Decl. 134.)  Accordingly, because the Plan provides a definition of the "own occupation" standard, the *Kinstler* standard does not govern here.  *See Simone v. Prudential Ins. Co. of Am.*, No. 04-CV-2076, 2005 WL 475406, at *7 (S.D.N.Y. Feb. 28, 2005) (explaining that the *Kinstler* court's elaboration of the term "regular occupation" was inapposite because the plan "explicitly state[d] that '[the defendant] will look at [a claimant's] occupation as it is *normally performed instead of how the work tasks are performed for a specific employer or at a specific location*.'" (first and second alterations added)); *cf. Onge v. Unum Life Ins. Co. of Am.*, No. 07-CV-1249, 2010 WL 3802787, at *10 (D. Conn. Sept. 20, 2012) (evaluating the plaintiff's claim under the plan's definition of "regular occupation" "'as it is normally performed in the national economy', not necessarily as performed by the plaintiff at her employment office," in contrast to the *Kinstler* definition); *accord Myers v. Life Ins. Co. of N. Am.*, No. 07-CV-6197, 2009 WL 742718, at *2, 17 (N.D. Ill. Mar. 19, 2009) (applying the definition of "regular occupation" in the plan, which required "consider[ation] [of] the duties of the occupation as it is normally performed in the general labor market in the national economy").  To determine the physical demand of DeCesare's job in the national economy, Aetna referred his case to Karickhoff to perform an "Own Occupation Comparison," and based on a comparison of DeCesare's job as a Creative Director of Marketing to a "Manager, Display," she concluded that the "DOT" classified his job as ""[l]ight."  (Bell Decl. 741.)  The Court notes that it may have been preferable for Aetna to consider the descriptions DeCesare and The Dress Barn offered of

46

his occupation.  (*See* Bell Decl. 541, 1420, 1691.)  Nevertheless, there was nothing arbitrary and

capricious in using the DOT to evaluate DeCesare's occupation in light of the Plan's definition

of "own occupation" as that which "is normally performed in the national economy instead of

how it is performed."  *See Thomas v. The Hartford Life Ins. Co. of Am.*, No. 11-CV-1490, 2013

WL 53710, at *2 (S.D.N.Y. Jan. 2, 2013) (explaining that "[a]lthough the DOT was last updated

in 1991, it is commonly used to evaluate generalized occupations in private disability disputes"

and "[i]t was reasonable for [the defendant] to interpret the [p]lan as permitting it to refer to the

DOT in its evaluation of [the plaintiff's] occupation in the 'general workplace' because the DOT

is a common tool utilized by insurers for that purpose"); *cf. Wedge v. Shawmut Design & Constr.*

*Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 340 (S.D.N.Y. 2014) (holding that the

defendant's "use of the DOT was not arbitrary and capricious in and of itself") (citation and

internal quotation marks omitted); *Barber v. Sun Life and Health Ins. Co.*, 894 F. Supp. 2d 174,

182–83 (D. Conn. 2012) (finding that the defendant's consideration of "the relevant and

applicable DOT job description and the insurance company's description of the position in

classifying [the claimant's] occupation as light duty" was reasonable).

### c.  Video Surveillance

Next, Plaintiff contends that "there is no evidence that Defendant[]s['] doctors actually

viewed all three [] days of the video tape surveillance of [] Plaintiff, but rather, reviewed the

bias[ed] summary report which provided conclusory statements that . . . DeCesare did not show

any signs of injury[,] the very conclusion for which [Dr. Garvey's] opinion was sought."  (Pl.'s

Mem. 15 (internal quotation marks omitted).)  Defendants' uncontested Rule 56.1 Statement,

however, represents that Kili sent Dr. Garvey the surveillance footage for her review and comment, and Dr. Garvey issued a supplemental report after reviewing RCG's materials.  (Defs.' 56.1 ¶¶ 207–08; Bell Decl. 728, 821–23.)  Moreover, Dr. Garvey does not state in her report that she relied only on RCG's summary report.  Instead, she described instances in the video where DeCesare was observed walking without difficulty and without the use of assistive devices, and commented that there was a contrast in DeCesare's gait observed on the day of the IME and the preceding day.  (Bell Decl. 822.)  At the very least, then, Dr. Garvey received the videotape surveillance, and her comments suggest that she reviewed not only RCG's report, but viewed the actual tapes.

Even assuming, however, that Dr. Garvey relied on RCG's report, there is nothing to suggest that the report was biased, other than Plaintiff's unsupported statement, which is not sufficient to create an issue of material fact on a motion for summary judgment.  *See Wrobel*, 692 F.3d at 30 (explaining that a nonmovant "need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing there is a genuine issue for trial" (emphasis and internal quotation marks omitted)).  Although Plaintiff complains that after reviewing RCG's report, Dr. Garvey determined that her initial conclusion that DeCesare required a permanent part-work restriction was incorrect, Dr. Garvey explained that, in her opinion, the surveillance information confirmed her initial view that "there was a degree of symptom magnification" and, based on the activities observed in the video, DeCesare was "able to perform normal work activities, full duty, for an 8-hour workday with no restrictions."  (Bell Decl. 823.)  As courts have noted, "surveillance is an acceptable way

48

to help evaluate a claimant's entitlement to disability benefits." *Burgio v. Prudential Ins. Co. of Am.*, No. 06-CV-6793, 2011 WL 4532482, at *6 (E.D.N.Y. Sept. 26, 2011) (collecting cases that have approved of a plan's consideration of surveillance video in assessing a plaintiff's claims for disability). Moreover, the video surveillance showed DeCesare driving, walking, sitting, bending, twisting, reaching, pushing, pulling, grasping, and lifting, which are the activities that Plaintiff informed Dr. Garvey he had trouble with and which would be required of him at his job. *See id.* (explaining that the use of the video surveillance in the plan's decision making was proper because, among other things, the "videos depict [the] [p]lainitff walking, driving, and carrying a bag that seemed to weigh at least ten pounds—the types of things he would do [during his job]"). Finally, Dr. Garvey did not rely solely on the video surveillance to reach her conclusion. *See id.* (noting that the defendant plan did not rely only on the videotapes in assessing the claimant's disability status); *Williams v. Hartford Life & Accident Ins. Co.*, No. 08-CV-369, 2010 WL 1418093, at *6 (W.D.N.Y. Apr. 6, 2010) (rejecting the plaintiff's argument that the video surveillance was "tainted" in part because the plaintiff's "benefits were terminated not only because of the video footage, but because the medical evidence as a whole did not support her claim"). Rather, Dr. Garvey conducted an in-person exam of DeCesare, reviewed his medical records, and considered the additional history and information he provided at his examination prior to reaching her final conclusion. (Bell Decl. 814–16.) Moreover, Defendants did not rely only on Dr. Garvey's opinion, but rather considered DeCesare's records, the opinions of his physicians, and two other doctors' assessments regarding his condition, as

discussed above.  There is nothing improper, then, about Defendants' use of the video

surveillance to evaluate DeCesare's subjective complaints of pain.

d.  The SSA's Determination

Plaintiffs also argue that in the Denial Defendants "failed to explain why they did not

credit the SSD award and did not provide any explanation of why the SS[A] award should not be

taken into account."  (Pl.'s Mem. 22.)  The Second Circuit has "encourage[d] plan

administrators, in denying benefits claims, to explain their reasons for determining that claimants

are not disabled where the SSA arrived at the opposite conclusion" so as to "further[] ERISA's

goal of providing claimants with additional information to help them perfect their claims for

subsequent appeals." *Hobson*, 574 F.3d at 92.  The failure to do so, however, does not render a

plan's determination arbitrary and capricious if there is nonetheless substantial evidence to

support the denial.  *See id.*  In other words, "while the SSA's determination can inform [a]

[c]ourt's review, it is not dispositive," and a plan may consider the SSA's determination but

"decline[] to give it dispositive effect."  *VanWright*, 740 F. Supp. 2d at 405.

Here, contrary to the cases that Plaintiff cites, there is ample evidence that Defendants

were aware of and considered the SSA's determination that DeCesare was disabled.  *Cf. Salomaa*

*v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011) (explaining that

"[w]eighty evidence" like an SSA's determination "may ultimately be persuasive, but it cannot

be ignored"); *Neely v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the*

*Elec. Indus.*, No. 00-CV-2013, 2004 WL 2851792, at *11 (E.D.N.Y. Dec. 8, 2004) (finding the

defendant's denial arbitrary and capricious, in part, because it "failed to review the decision of

50

the [SSA] to grant [the plaintiff] disability benefits"). DeCesare submitted his Notice of Award dated July 31, 2010 from the SSA to Defendants. (Bell Decl. 894–98.) In the Denial, Defendants acknowledged the fact that DeCesare was receiving SSDI benefits, but informed him that they gave this factor "little weight in [their] determination of whether he [was] eligible for LTD benefits," because of Aetna's conclusion that DeCesare was no longer disabled based on the Plan's definition of totally disabled. (Defs.' 56.1 ¶ 229; Bell Decl. 1985.) As the terms of the policy control whether or not a claimant is disabled, *see VanWright*, 740 F. Supp. 2d at 401–02, Defendants' decision to rely on the Plan's definition of totally disabled, despite the SSA's conclusion that DeCesare qualified for SSDI benefits, was not arbitrary and capricious. *See Toppalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 351 (E.D.N.Y. 2013) (holding that in making its determination that the plaintiff was not disabled as defined by the plan, the defendant "was not bound by the SSA's disability finding nor required to accord special deference to the SSA's determination"); *Rund v. JPMorgan Chase Grp. Long Term Disability Plan*, 855 F. Supp. 2d 185, 203 (S.D.N.Y. 2012) (finding that the defendants did not act in an "arbitrary and capricious manner with respect to according weight to the SSA determination" because the defendants "certainly considered the determination of the SSA and explained to the plaintiff the different definitions and standards used"); *Billinger v. Bell Atl.*, 240 F. Supp. 2d 274, 285 (S.D.N.Y. 2003) ("The definition of disability to be employed by a benefit plan when evaluating a claim for long-term disability benefits is the one set forth in the plan documents, not the one used by the [SSA]."), *aff'd*, 124 F. App'x 669 (2d Cir. 2005). This is especially true where, as here, the SSA award "does not provide an explanation for its determination" or otherwise prove

Plaintiff's disability.  *Schlenger v. Fidelity Employer Servs. Co., LLC*, 785 F. Supp. 2d 317, 345 (S.D.N.Y. 2011).

### e.  Nurse Studenorth's Opinion

Plaintiff argues that Defendants' "reliance upon the reviews and opinions of Nurse Studenroth[,] which [were based on] a medical file review . . . [was] arbitrary and capricious" because "she never personally examined . . . DeCesare, and did not have the benefit of any personal contact with . . . Plaintiff before rendering her opinion."  (Pl.'s Mem. 24 (internal quotation marks omitted).)  To support this argument, Plaintiff relies on *Westphal v. Eastman Kodak Company*, No. 05-CV-6120, 2006 WL 1720380 (W.D.N.Y. June 21, 2006), in which the court held that a plan's denial of benefits was arbitrary and capricious because "[d]espite . . . substantial medical evidence provided by [the] plaintiff's treating physicians and an independent examining physician concluding that the plaintiff [was] disabled," the plan administrator found that the plaintiff was not disabled based on "the reports of two doctors who never examined or treated the plaintiff."  *Id.* at *4.

*Westphal* is distinguishable from the facts here for several reasons.  First, there is no evidence in the record that Defendants in whole or in part relied on Nurse Studenroth's review in concluding that DeCesare was not totally disabled.  In its list of documents that were considered in making the determination to terminate Plaintiff's LTD benefits, the Denial does not mention any reports or findings by Nurse Studenroth.  (*See* Bell Decl. 1978–79.)  Likewise, nothing in the denial of DeCesare's appeal relies on or otherwise describes any conclusions by Nurse Studenroth.  (*See id.* at 518–21.)  Indeed, after Nurse Studenroth reviewed DeCesare's medical

records and determined that it was unclear if the clinical information supported DeCesare's impairment, she recommended that Aetna retain an independent peer review physician.  (Bell Decl. 627, 650.)  Based on this recommendation, Defendants did not determine that DeCesare was not totally disabled, but rather retained Dr. Swotinsky.  Second, unlike in *Westphal*, here Dr. Garvey conducted an in-person examination of DeCesare, which Defendants relied on, in part, to reach their conclusion.  Finally, even assuming that Defendants in some way relied on Nurse Studenroth's opinion, here, unlike the record in *Westphal*, there is not substantial evidence that documents DeCesare's disability, as discussed above.  There was nothing arbitrary and capricious, then, in the use of Nurse Studenroth's opinion to retain an independent peer review physician.

### f.  Full and Fair Review

Finally, Plaintiff contends that Aetna did not afford DeCesare's claim for benefits a full and fair review because it "ignored and failed to properly take into account the medical file and the opinions of his health care providers."  (Pl.'s Mem. 17.)  Specifically, DeCesare claims that "Defendant[]s['] complete reliance upon a claim that Plaintiff 'failed to produce clinical findings' or 'document range of motion deficits,' or produce 'evidence of any significant physical examination findings at all' shows that Defendant[s] did not consider the other evidence produced by [P]laintiff."  (*Id.* at 18.)  The Court disagrees.  There is nothing in the record to suggest that Defendants ignored Plaintiff's medical records.  To the contrary, Studenroth and three doctors—Dr. Swotinsky, Dr. Garvey, and Dr. Lichtenfeld—reviewed DeCesare's records (including MRIs and X-rays) and spoke with or attempted to contact his treating physicians.

53

(Bell Decl. 520, 625–27, 637–38, 650, 669, 804–09, 814–23, 1086–93.)  Based in part on DeCesare's records and evidence submitted by his treating physicians, Defendant's doctors concluded that there was no objective evidence to support Plaintiff's claim of total disability.  To provide a "full and fair review" of DeCesare's claim, the Plan "need not accord [DeCesare's] treating physician[s] greater deference than [the] [P]lan's retained physician[s]." *Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006) (internal quotation marks omitted); *see also Fitzpatrick v. Bayer Corp.*, No. 04-CV-5134, 2008 WL 169318, at *13 (S.D.N.Y. Jan. 17, 2008) (concluding that "[g]iven [the] [p]laintiff's failure to offer sufficient objective evidence in support of her claim of disability, it cannot be said that the committee's decision to credit some evidence over other evidence in denying [the] [p]laintiff's claim was unreasonable").  Accordingly, the fact that DeCesare's treating physicians disagreed with the physicians that Aetna retained does not, without more, make the decision to deny benefits arbitrary and capricious.  Moreover, there is nothing unreasonable about Defendants' requests that DeCesare provide objective evidence to support his alleged physical limitations.  *See Ianniello*, 2012 WL 314872, at *3 ("It was plaintiff's burden to demonstrate her disability under the terms of the plan, and it was reasonable for Hartford to require objective evidence to support her alleged physical limitations."); *Aitkins*, 2008 WL 820040, at *14 (explaining that "several courts in this district have found that it is not unreasonable or arbitrary for a plan administrator to require the plaintiff to produce objective medical evidence of total disability in a claim for disability benefits" and collecting cases (internal quotation marks omitted)).  Indeed, DeCesare had the burden of proving by a preponderance of evidence that he was totally disabled within the

meaning of the Plan, *see Paese*, 449 F.3d at 441, and despite Aetna's multiple requests that

DeCesare provide objective evidence of his total disability, (Bell Decl. 463, 478, 679, 1109,

1672, 1985–86, 2005), he failed to do so.[9]  After affording DeCesare multiple opportunities to

demonstrate he was totally disabled within the meaning of the Plan, Defendants' conclusion that

he did not meet his burden by failing to submit objective evidence did not "depriv[e] [him] of

full and fair review," *Hobson*, 574 F.3d at 88–89.

  To the extent that Plaintiff claims that Defendants did not provide adequate notice, as

required by 29 U.S.C. § 1133(1), the Court disagrees.  As discussed above, in the Denial, Aetna

stated what information it had considered in reaching the conclusion that DeCesare was not

entitled to LTD benefits and explained that there was a lack of objective evidence to support that

DeCesare satisfied the Plan's definition of disability.  (Bell Decl. 1978–79, 1984.)  Moreover,

Aetna explained DeCesare's appeal rights and provided him with a list of information that he

could submit to support the restrictions and limitations of which he complained.  (Bell Decl.

1985–86.)  *Cf. Cook v. N.Y. Times Co. Long-Term Disability Plan*, No. 02-CV-9154, 2004 WL

203111, at *11 (S.D.N.Y. Jan. 30, 2004) (explaining that the defendant violated ERISA's

regulations by failing "to provide 'a description of any additional material or information

necessary for the claimant to perfect the claim and an explanation of why such material or

information [was] necessary'" (quoting 29 C.F.R. § 2560.503-1(g)(iii)).  In the denial of the

---

[9] Plaintiff suggests that Aetna attempted to "pressure" Plaintiff's doctors by providing them notice of the video surveillance and of Dr. Garvey's supplemental report. (Pl.'s Mem. 8–9.)  Aetna's internal review note, however, merely states that it sent a copy of the video to the "physicians for review and comment and response within the next 14 days." (Bell Decl. 737.)  Plaintiff points to no evidence that his treating physicians were "pressured" into changing their

appeal, Aetna again summarized the information it considered in evaluating DeCesare's claim and explained that it was denying him LTD benefits because of the lack of objective medical evidence he submitted to support his claim.  (Bell Decl. 518–21.)  Accordingly, Aetna "provide[d] [DeCesare] with information necessary for him . . . to know what he . . . must do to obtain the benefit . . . [and] enable[d] [him] effectively to protest that decision."  *Juliano*, 221 F.3d at 287 (2d Cir. 2000); *see also Baackes v. Kaiser Found. Health Plan, Inc.*, 990 F. Supp. 2d 228, 240 (N.D.N.Y. 2014) ("There is nothing in the record to support Plaintiff's claim that Defendants violated ERISA's § 1133's full and fair review requirement.  Rather, the evidence unequivocally demonstrates that Plaintiff had a full and fair opportunity to address the accuracy and reliability of his claim." (internal quotation marks omitted)).

### III.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted. The Clerk of the Court is respectfully requested to terminate the pending motion, enter judgment for Defendants, and close the case.  (*See* Dkt. No. 35.)

SO ORDERED.

Dated: March 26, 2015
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

opinions.  Instead, Aetna merely asked them to respond to the video.